UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
FOURTH DIVISION

NETRATINGS, INC.,

Plaintiff,

v.

DIGITAL RIVER, INC., *et al.,*

Defendants.

Civil No. 06-3988(JMR/FLN)

**NETRATINGS, INC.'S OPENING CLAIM CONSTRUCTION BRIEF**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

PRELIMINARY STATEMENT ...........................................................1

## POINT I

BACKGROUND ................................................................................2

A.   Case History.............................................................................2

B.   The Parties ...............................................................................3

   1. Plaintiff NetRatings, Inc. ......................................................3

   2. The Defendants.....................................................................4

C.   NetRatings' Patented Inventions .............................................5

   1. Technology Background ........................................................5

   2. The '510 and '680 Patents.....................................................8

   3. The '637 Patent....................................................................11

   4. The '386 and '155 Patents....................................................13

## POINT II

ARGUMENT ...................................................................................14

A.   Legal Standards for Claim Construction ...............................14

B.   Terms From the '510 and '680 Patents ..................................16

   1. *local computer use meter/user meter (Letter p. 1)* ..................16

   2. *log of predetermined [machine operation] events (Letter p. 2)*...............17

   3. *stored in an associated user computer machine (Letter p. 3)* .................20

   4. *identify titles of open windows and reflects a log of titles of worldwide web pages; identify titles of windows and world wide web pages (Letter p. 3)* ...................22

C.   Terms From the '155 and '386 Patents ..................................24

   1. *the downloading of the first resource causes the downloading of the tracking program (Letter p. 4)* .................24

   2. *third server (Letter p. 4)* .....................................................25

D.    Terms From the '637 Patent ..........................................................26

    1.  *Application of 35 U.S.C. § 112 (6) to the '637 Patent* ...........................26

    2.  *Means Plus Function Terms* ...................................................27

    3.  *instructions for causing content to be displayed
        by the computer system (Letter p. 7)* .......................................30

CONCLUSION ...................................................................32

# TABLE OF AUTHORITIES

*Affymetrix, Inc. v. Hyseq, Inc.*,
  132 F. Supp. 2d 1212 (N.D. Cal. 2001) ........................................................ 37

*Bd. of Regents of the Univ. of Texas Sys. v. Eastman Kodak Co.,*
  Civ. Action No.: SA-04-CA-912-XR, 2006 U.S. Dist. LEXIS 7997
  (W.D. Tex. Jan. 26, 2006) ............................................................................. 27

*Digeo, Inc. v. Audible, Inc.,*
  Case No. C05-464JLR, 2006 U.S. Dist. LEXIS 22715
  W.D. Wash. Mar. 27, 2006) ........................................................................... 27

*Gillette Co. v. Energizer Holdings, Inc.*, 405 F.3d 1367 (Fed. Cir. 2005) ........ 25

*Honeywell Int'l, Inc. v. Universal Avionics Systems Corp.*,
  493 F.3d 1358 (Fed. Cir. 2007) ..................................................................... 15

*McKesson Info. Solutions LLC v. The Trizetto Group, Inc.,*
  426 F. Supp. 2d 197 (D. Del. 2006) .............................................................. 27

*Monsanto Co. v. Syngenta Seeds, Inc.*,
  2007 U.S. App. LEXIS 23255, at *7 (Fed. Cir. 2007) .................................. 26

*Nystrom v. Trex Co.*,
  424 F.3d 1136, (Fed. Cir. 2005) .................................................................... 20

*On-Line Tech v. Bodenseewerk Perkin-Elmer*,
  386 F.3d 1133 (Fed. Cir. 2004) .............................................................. 15, 22

*Phillips v. AWH Corporation*,
  415 F.3d 1303 (Fed. Cir. 2005) ............................................................. *passim*

*Verizon Servs. Corp. v. Vonage Holdings Corp.*,
  2007 U.S. App. LEXIS 22737 ....................................................................... 24

*WMS Gaming Inc. v. Int'l Game Tech.,*
  184 F.3d 1339 (Fed. Cir. 1999) .................................................................... 27

## PRELIMINARY STATEMENT

Plaintiff NetRatings, Inc. ("NetRatings") submits this opening brief and accompanying declaration in support of NetRatings' constructions of terms from the asserted claims of the asserted patents.[1]

This case is a dispute between competitors in the growing field referred to as Web analytics, in which companies track and report on how people use various resources on the Web. NetRatings, in this business since 1997, owns a portfolio of key patents in the field, five of which are asserted in this case against the defendants (collectively, "Digital River").[2]

NetRatings believes that most of the terms from the asserted patents are readily understood and do not require construction. NetRatings provides

---

[1]  The asserted patents are U.S. Patent Nos: 5,675,510 (the "'510 patent"); 6,115,680 (the "'680 patent"); 6,138,155 (the "'155 patent"); 6,763,386 (the "'386 patent"); and 6,108,637 (the "'637 patent"), and are Exhibits A-E to the Declaration of Seth H. Ostrow dated November 13, 2007 ("Ostrow Decl."). Certified copies of the file histories for the asserted patents are being submitted on a CD Rom labeled "Certified Patent File Histories" with the Declaration of Karine Louis dated November 13, 2007 (due to their voluminous nature).

[2]  Since 2005, NetRatings licensed the asserted patents to multiple Web analytics companies following lawsuits similar to the present action. Licensed companies include Visual Sciences, LLC; Sagemetrics Corp.; Omniture, Inc.; Coremetrics, Inc.; Unica Corporation; and WebSideStory, Inc. Claim construction proceedings were held in five cases, two of which settled before a decision issued and three of which are still pending, as follows: *NetRatings, Inc. v. 180solutions, Inc.*, 06-3353 (BSJ) (HP) (S.D.N.Y) (hearing and matter under advisement); *NetRatings, Inc. v. WebTrends, Inc.*, 06-01420 (HA) (D. Or.) (hearing and matter under advisement); *NetRatings, Inc. v. WhenU.com, Inc.*, 06-3556 (PKC) (GWG) (S.D.N.Y.) (hearing scheduled for November 19, 2007).

constructions as appropriate alternatives to Digital River's erroneous constructions, should the Court believe construction would be helpful.

NetRatings' proposed constructions follow the mandate of the Federal Circuit, relying on the intrinsic evidence, affirmed by relevant dictionary and treatise definitions. On the other hand, Digital River's constructions improperly limit the claims to arbitrary described embodiments or limitations without any support in the intrinsic evidence. Digital River will be shown to infringe, even under its own constructions. Still, the asserted patents must be properly construed and in a manner which will facilitate the jury's understanding at trial. NetRatings' constructions meet these goals and satisfy the prevailing claim construction standards.

## POINT I

## BACKGROUND

### A.    Case History

NetRatings filed its initial complaint on October 5, 2006, naming Digital River, Inc. and Fireclick, Inc. as defendants. *See* Docket Item ("DI") 1. On August 7, 2007, NetRatings filed an amended complaint, adding parties Digital River E Business Services, Inc., Bluehornet Networks, Inc. and Direct Response Technologies, Inc. a/k/a Digital River Marketing Solutions, Inc. *See* DI 67. In

accordance with the Court's October 19, 2007 instruction, through a series of meet and confers, the parties have concluded on a list of ten terms for construction.[3]

## B.    The Parties

### 1.    Plaintiff NetRatings, Inc.

NetRatings, founded in 1997, is part of The Nielsen Company family of businesses, and a subsidiary of ACNielsen Corporation and Nielsen Media Research, Inc. ("Nielsen").  The Nielsen companies engage in consumer research in various media such as the Internet, television and mobile technologies. NetRatings offers a broad range of technology-driven Internet information products and services that enable customers to make informed decisions regarding their Internet strategies.  By way of example, NetRatings' products provide the ability to learn what web sites users are visiting, details regarding Internet user preferences, and information regarding the frequency of user visits to web sites.

NetRatings and Nielsen acquired the asserted patents over a period of time from several entities.  The asserted patents were invented and filed between 1995-1997, during the early development of the World Wide Web, by entrepreneurs who had the vision to recognize new commercial opportunities on the web and ways to

---

[3]  While NetRatings believes most all of the larger set of terms identified by Digital River for construction do not require construction, NetRatings proposed alternate constructions in view of Digital River's incorrect constructions.  NetRatings reserves its rights with respect to all of its proposed construction of terms which were omitted from the ten addressed herein.

improve upon them.  In turn, NetRatings and Nielsen recognized that these inventors had made significant contributions to their fields in ways that related to their businesses and, accordingly, obtained the rights to the patents through a series of transactions from 1997-2003.

### 2.     The Defendants

Defendant Digital River describes itself as "a leading provider of global e-commerce solutions for software and consumer technology."  Ostrow Decl. Ex. F.  In conjunction with one or more of its subsidiaries, Digital River provides "a hosted application service that automatically gathers and stores data for online business."  Ostrow Decl. Ex. G.  Through use of "JavaScript tracking code," Digital River "track[s] anonymous information about…Web site visitors' activity."  Ostrow Decl. Ex. H.

As described by Digital River, in conjunction with its subsidiaries, Digital River provides its customers with software to "automatically collect a mountain of data about your [web] site and what your visitors are doing there."  Ostrow Decl. Ex. I.  Digital River further provides its customers with email marketing software to collect and report on various online activity, including link clicks, sent email message statistics, and product purchases.  Ostrow Decl. Exs. J and K.  In addition to the foregoing, Digital River provides affiliate tracking software, which includes functionality to "track impression, clicks, leads, sales, sub-sales, and co-

registration offers."  Through use of "cookies and tracking code on [website

pages]," Digital River collects and reports on information including "IP Address

and Time/Date of all traffic, the referring website of leads/sales, and specific sale

details including date, transaction ID, product, amount, etc."  Ostrow Decl. Ex. L.

## C.     NetRatings' Patented Inventions

### 1.     Technology Background

In computer networks, such as the Internet, individual computer users use

their computers (also referred to as "client" computers) to access various types of

resources on a network.  These resources (*e.g.,* web pages, games, ad banners) are

sometimes referred to as "content."  In the context of the Web, resources generally

consist of HTML documents.  An HTML document is stored on a server located at

a content provider site (*e.g.,* www.sears.com) and is made up of text and references

to other resources, or content, from different locations on the Web.  *See, e.g.,* '637

patent, col. 2, ll. 24-29; '155 patent, col. 5, ll. 17-27.

Client computers use a computer program such as a browser (*e.g.,*

Microsoft's Internet Explorer) to select and display web pages stored at different

content provider sites.  *See* '637 patent, col. 2, ll. 6-12.  Generally, a client

computer makes a "request" to a server at a content provider site to obtain the

content and, upon receipt of the request, the server transfers the content to the

client computer.  *See, e.g.,* '637 patent, col. 2, ll. 11-24.  The browser at the client

computer uses the HTML document to generate a display of the web page or other resource on the client computer. *See, e.g.,* '637 patent, col. 2, ll. 28-36.

With the rapid expansion of the use of personal computers during the early 1990s, the dissemination of electronic information and the desire to measure the use of computer related resources increased significantly. '510 patent, col. 1, ll. 10-33.[4] However, until the inventions described in the asserted patents, information regarding such use was only collected at the server side, that is, the location of the server which received the requests for content. The server would log every request for content that it received, creating a record often referred to as a "log file." *See, e.g.,* '637 patent, col. 1, l. 65 – col. 2, l. 36. This server side data collection method had a serious disadvantage however. Specifically, it did not (and still cannot) provide information about what was occurring at the client computer (or "client side") after the content left the server. For instance, the server, while capable of recording every request it receives from multiple client computers, cannot record requests made by the same client computers to other servers. Thus, a company like Sears can determine, using its server, how many requests were made for content at its own web site, but Sears cannot determine how many requests were made at JC Penney's web site. Similarly, Sears cannot

---

[4] The specifications of the '510 and '680 patents are identical in all respects relevant to this case and accordingly, for ease of reference, citations are made to the '510 patent unless otherwise indicated.

tell whether the same Internet user that made a request at its web site also made a request at the JC Penney web site.  Nor can Sears determine, using its server, what an Internet user did with the content Sears provided in response to the request.  In other words, the server computer cannot capture what is occurring at the client computer or monitor the user's display, use or interaction with the content it provides.[5]

The numerous, significant inventions claimed in NetRatings' asserted patents solved these and other problems associated with the prior art.  The inventions of the '510 and '680 patents provided the breakthrough technology of putting software on the client computer to monitor what Internet users were doing on the web.  Through the inventions of the '510 and '680 patents, it is now possible to determine what web sites Internet users visit, either individually or collectively.[6]  The inventions of the '637 patent took this technology a step further in delineating that the software used to monitor what was occurring at the client

---

[5]  There are other deficiencies with server side data collection (*e.g.,* server log files may not accurately represent unique requests for a single Web page, may be subject to manipulation, or may not accurately reflect the requestor).  '637 patent, col. 2, l. 62 – col. 4, l. 31.

[6]  Thus, where software on the server side can log how many requests for content were made at *one specific* web site, software on the client side can log how many requests for content were made by each client computer to *any* web site.  The software used at the client side may be written in many computer programming languages, such as C++, Java or Javascript, to name just a few examples.  A preferred language is one which is platform independent – and therefore can be implemented on most client computers, regardless of the specific configurations of such computers. *See, e.g.,* '637 patent, col. 11, ll. 42-52.

computer be downloaded from content provider sites, and using such software to monitor whether and how the downloaded content was actually displayed on the client computer.  Finally, with the inventions of the '155 and '386 patents, additional ways of obtaining the monitoring software were identified and the collection of specific details regarding Internet users' use and interaction with resources, such as web pages, was enabled.  Collectively, all of this technology now forms the basis for the Web analytics industry.

### 2.      The '510 and '680 Patents

The '510 and '680 patents relate to monitoring – using software located on individual client computers – what individuals are doing on their computers and analyzing and reporting on the collected data.  *See* '510 patent, col. 1, ll. 5-8; col. 2, ll. 12-50.  This is accomplished by capturing data at the client computer that identifies what software applications and web pages the user is accessing.  *See, e.g.,* '510 patent, col. 1, ll. 22-23, 36-44; col. 2, ll. 21-50.  Collected information is transmitted from the individual computers to a central processing location, where the information from many individual computers may be assimilated, translated, evaluated and reported on.  *See, e.g.,* '510 patent, col. 2, ll. 62-67.  The data collected, for example, identifies or describes open windows on a client computer (*e.g.*, identifying an e-mail window from America Online) or strings of characters

reflecting on-line activity (*e.g*., a URL which specifies a location on the web).[7] *See, e.g.,* '510 patent, col. 4, ll. 12-24; col. 2, ll. 35-50.

In one embodiment, as shown in Figure 1 from the '510 and '680 patents reproduced below, a meter (1) installed on a personal computer logs events occurring at that computer, such as a user's accessing a web page, and transmits (at 2) the data (11) to a central processing station.  The central processing station collects data from multiple separate personal computers and loads the data into a database (13).  A data dictionary (14) interprets the data and the interpreted data is used to generate reports (at 6) showing information derived from the data.  Accordingly, the web usage activity from multiple individual users is collected, and reports can be provided that show information such as how many different people went to a particular web site, or what different web sites a specific person visited.

---

[7]  URLs, or Uniform Resource Locators, identify locations on the web from which data or a computer program may be downloaded.



*FIG. 1*

Fig. 1, '510 patent.

### 3.    The '637 Patent

The '637 patent describes improved ways of delivering computer code to user computers over a network and of monitoring the actual display or observation of content provided to such users over the network. *See* '637 patent, col. 1, ll. 5-12.  In particular, the '637 patent describes programs that enable monitoring, at user computers, details associated with the display of content in a particular web page to produce monitoring information from which conclusions regarding the observation of the display may be deduced.  '637 patent, col. 6, ll. 44-48.

In one embodiment, as shown in Figures 3A, 3B and 3C reproduced below, a request for a web page is made to a content provider web site. *See* Fig. 3A.  The computer code for monitoring the display of the web page is transferred to a user computer with the web page. *See* Fig. 3B. *See also* '637 patent, col. 11, ll. 57-63. In various embodiments of the '637 invention, the computer code detects details regarding the display of the web page, such as how long the web page was displayed, whether it was hidden or obstructed on  the display, the size or position of the display, and whether a user moved a pointer over a portion of the web page. *See, e.g.,* '637 patent, col. 13, l. 30 - col. 16, l. 46.  The collected information is then transferred back to the content provider, as shown in the example of Fig. 3C or to a third party that collects and reports on such information on behalf of many content providers.

11



Figs. 3A-3C, '637 patent.

### 4.    The '386 and '155 Patents

The '386 and '155 patents build on the core data collection mechanisms

provided in the '510, '680 and '637 patents by describing techniques for alternative

delivery of monitoring programs to users and for monitoring details of individuals'

use of or interaction with resources such as web pages.  *See, e.g.,* '155 patent, col.

1, ll. 12-17.  In some embodiments, a tracking program for collecting data

regarding the use of the resource is downloaded from a different server on the

network from the server that provided the resource.  *See, e.g.,* '155 patent, claim 1.

The server that provides the computer tracking program in this latter example can

be dedicated to providing the program to multiple client computers.  This may be

beneficial in permitting, among other things, changes to be made to the program at

the one server rather than at all the different client computers.

As described in the '386 and '155 patents, the type of data collected might

include data regarding an individual's interaction with a resource such as an

interactive ad banner or game and indicate, for instance, what features of a game

were played.  *See, e.g.,* '386 patent, col. 13, ll. 56-65.  The patent also makes

possible, among other things, data collection about the use of a resource, as well as

that which may enable an association to be made between the use data and the

client computer on which the use occurred.  *See, e.g.,* '155 patent, col. 5, ll. 1-7;

'386 patent, col. 4, ll. 29-42.  For example, a database of information can be

created using collected data that includes information about users who have visited a web site and includes information about such users' use of the site, such as what different pages on the site the user went to and in what order.  The information in the database can be analyzed to facilitate the determination of individual user interests and user preferences.  *See* '386 patent, col. 12, l. 61 – col. 13, l. 26.

## POINT II

## ARGUMENT

### A.    Legal Standards for Claim Construction

In *Phillips v. AWH Corporation*, 415 F.3d 1303 (Fed. Cir. 2005), the Federal Circuit reaffirmed and clarified the basic principles of claim construction.

"[T]he words of a claim 'are generally given their ordinary and customary meaning,'" as would be understood by a person of ordinary skill in the art "as of the effective filing date of the patent application."  *Phillips,* 415 F.3d at 1312-13. *See also Digital Angel Corp. v. Datamars, Inc.*, Case No. 04-4544, 2006 WL 1425465, at *3 (D. Minn. May 22, 2006) (same).  The person of skill in the art is deemed to read the claim term in the context of the entire patent, including the claims and specification.  *Phillips*, 415 F.3d at 1313.

Where the ordinary meaning of claim language is readily apparent, as it is here in the overwhelming number of claim elements, claim construction "involves little more than the application of the widely accepted meaning of commonly

understood words." *Phillips,* 415 F.3d at 1314.  In such a case, "general purpose

dictionaries may be helpful." *Id.*  Where the meaning of terms is not clear, courts

may look to sources available to the public that will help determine how a person

of skill in the art would understand the disputed claim language. *Id.*

   The claims should be read in view of and consistent with the patent

specification.  In doing so, one must avoid reading limitations from the specification

into the claims. *Phillips,* 415 F.3d at 1323.  Although a specification often

describes very specific embodiments of the invention, or only one embodiment,

claims are not to be construed as being limited to the described embodiments absent

a clear definition of a claim term or a clear disclaimer or disavowal of claim scope.

*Phillips,* 415 F.3d at 1323.  *See also Honeywell Int'l, Inc. v. Universal Avionics*

*Systems Corp.*, 493 F.3d 1358, 1361 (Fed. Cir. 2007) (same).

   The Court may also consider extrinsic evidence (all evidence other than the

patent and prosecution history) but such evidence is less significant (*Phillips,* 415

F.3d at 1317-18) and "cannot be used to alter a claim construction dictated by a

proper analysis of the intrinsic evidence." *On-Line Tech v. Bodenseewerk Perkin-*

*Elmer*, 386 F.3d 1133, 1139 (Fed. Cir. 2004).

**B.     Terms From the '510 and '680 Patents**

**1.     *local computer use meter/user meter*** *(Letter p. 1)*[8]

Consistent with their usage in the patents, a "local computer use meter" and

a "user meter" should be defined as "a software program designed to collect

information regarding the use of other software programs on a computer on which

the software program is installed."  The intrinsic evidence clearly indicates that the

'meter' is software (*e.g.,* a software module) designed to collect information

regarding the use of software on a computer on which the software is installed (i.e.,

"local").  *See, e.g.,* '510 patent, col. 2, ll. 21-22, 36-38 (referring to a "meter

application"); col. 1, ll. 36-38 ("object of the invention to facilitate . . . collection

of reliable information regarding the use of personal computer software"); Ostrow

Decl. Ex. N, at A00393 (12/26/96 Response to Office Action at 3) (a "computer

use meter in the form of a software module is installed on personal computers").

In contrast to NetRatings' construction, which draws on the intrinsic

evidence without unduly narrowing the claimed meters, Digital River's

construction adds multiple, inappropriate limitations.  For instance, Digital River

takes certain embodiments described in the specification and inserts them as

required aspects of the meter, such as that the meter "operate within its own

---

[8]  The location of the parties' respective constructions are referred to herein with
reference to the chart attachment to the parties' Nov. 9, 2007 letter to the Court ("Letter
p. __"), a copy of which is Ex. M to the Ostrow Decl.

window" and be "intended to undergo updates." Letter p. 1. While the specification indeed describes illustrative embodiments where a portion of the meter operates within its own window (col. 6, ll. 14-16) or undergoes updates (col. 3, ll. 6-7), as *Phillips* stated, embodiments described in the specification should not be read into the claims. *See, e.g., Phillips,* 415 F.3d at 1323. Digital River would also require that the meter "permanently" reside on a personal computer. Notably, however, the word "permanently" never even appears in the specification, literally or conceptually. Accordingly, Digital River's proposed construction which attempts to import myriad details, some of which are example embodiments and others which do not even appear in the intrinsic evidence, should be rejected.

## 2. *log of predetermined [machine operation] events (Letter p. 2)*[9]

The claimed meters record data regarding events relating to the use of personal computer software and on-line services. *See, e.g.,* '510 patent, col. 1, ll. 36-44. The types of events for which data will be collected are selected in advance to facilitate the collection – in other words, the meter is programmed to collect data on selected events, *if and when they occur*, in which case it operates to collect that type of data. Also, it is evident that the meter does not include the events themselves, but rather a record of data regarding the events. In accordance with the

---

[9] The phrase "log of predetermined machine operation events" appears in claim 1 of the '510 patent. The phrase "log of predetermined events" (without being limited to *machine operation* events) appears in claims 1, 4, 10-12, 15, 21 and 22 of the '680 patent.

intrinsic evidence, as well as the plain meaning, the term "log of predetermined [machine operation] events" should be defined as "a record of data regarding the occurrence of pre-selected potential events [related to machine operations]." NetRatings' proposed construction is fully in accord with the intrinsic evidence and ordinary meaning of the words "log" (a record) and "predetermined" (decide/determine beforehand). *See, e.g.,* '510 patent, col. 2, ll. 21-50; col. 3, ll. 40-65; col. 4, ll. 56-63; Fig. 1. *See also* Ostrow Decl. Ex. O, *McGraw-Hill Dictionary of Scientific and Technical Terms* (Sybil P. Parker ed., 5th Ed. 1994) ("*McGraw-Hill*") at 3 (multiple definitions of log in different contexts, all a "record" of various items); Ostrow Decl. Ex. P, *The Merriam-Webster Dictionary* (1997) ("*MW*") at 3 (log is "regularly kept record"); Ostrow Decl. Ex. Q, *Webster's II New College Dictionary* (1995) ("*Webster's II*") at 4 (log is a "record" of "events"); *Webster's II* at 5 (predetermine); *MW* at 4 (predetermine).

Digital River's construction reflects a calculated effort to build unsupported, narrowing limitations into the term. For instance, Digital River's construction requires that the "log of predetermined [machine operation] events" be "a file" which contains "multiple chronological records or entries." Letter p. 2. While in some embodiments, the patents refer to the log as being in the form of a file, the patents also refer to the log generally, and an event log. There is no requirement in the intrinsic evidence that the "log" must always be a "file" and the repeated

references to the log without use of the word "file" confirm this. *See, e.g.,* '510 patent, col. 2, l. 54 ("data log"; "log"); col. 2, ll. 58 and 59 ("event log"); col. 2, l. 64 ("local personal computer use logs").

Digital River also proposes that the "log of predetermined [machine operation] events" must contain multiple chronological records or entries of events. Again, there is no such requirement in the intrinsic evidence. Indeed, the specification never uses the term "chronological" and inclusion of the date or time of events is optional. *See, e.g.,* '680 patent, claims 3 and 14 (dependent claims reciting logging date and time information); '510 patent, col. 8, ll. 12-14 ("[t]he log file *may* also include columns for a date stamp and a time stamp") (emphasis supplied). Examples in the specification of log entries arranged chronologically should not be imported into the claim language to limit it. *See CCS Fitness, Inc. v. Brunswick Corp.,* 288 F.3d 1359, 1366 (Fed. Cir. 2002) (accused infringer cannot "narrow a claim term … by pointing to the preferred embodiment or other structures or steps disclosed in the specification or prosecution history"). Indeed, other examples in the specification show multiple events which are not chronological, and to limit to just one embodiment would be inappropriate. *See, e.g.,* '510 patent, col. 8, l. 33 - col. 9, l. 22.

Additionally, Digital River's construction requires that a log of *machine operation* events be limited to "operating system messages." This construction

confuses "messages" with "events."  The '510 and '680 patents describe

intercepting of operating system messages as a way to know that events have

occurred, not as the events themselves -- the events are the *occurrences or actions*,

not the *messages*.  Further, Digital River's proposed construction would violate the

doctrine of claim differentiation as claim 10 of the '510 patent explicitly recites

generating a log through the use of "operating system messages."  As stated by the

Federal Circuit, "[w]hen different words or phrases are used in separate claims, a

difference in meaning is presumed."  *Nystrom v. Trex Co.*, 424 F.3d 1136, 1143

(Fed. Cir. 2005).

     For the foregoing reasons, Digital River's proposed construction should be

rejected and NetRatings' be adopted by the Court.

     **3.**     ***stored in an associated user computer machine*** *(Letter p. 3)*

     The above term appears in claim 1 of the '680 patent and is readily

understandable upon a plain reading of the claim language.  NetRatings proffers its

construction of "placing each of the events in the log in memory of the user

computer on which the local computer use meter is installed" as an alternative to

Digital River's erroneous construction.

     The principal error with Digital River's construction appears to stem from

Digital River's misreading of the claim term "associated."  The word "associated"

in the claim denotes that each meter and its corresponding log are joined in their

same respective computer machines.  *See, e.g.,* Ostrow Decl. Ex. Q, *Webster's II* at

3 (associate is "[t]o connect or join together"); Ostrow Decl. Ex. R, *Webster's New*

*World Dictionary* (1988) ("*WNW*") at 3 (associate is "to join together; connect;

combine").  This is also shown through the term's context in the claim.

Specifically, the first element of claim 1 recites:

> a *plurality* of local computer use meters installed in user computer
> machines, *each* user meter including a log of predetermined events
> *stored in an associated user computer machine*, wherein said log …

Claim 1, '680 patent (emphasis added).

As can be seen, the claim shifts from describing the plurality of meters to

each singular meter and log on each user computer machine and, to confirm that

"each meter" and its respective "log" are on the same computer, the claim recites

that the log is stored on the "associated computer machine."

Digital River's construction which calls for the log to be on a ***different***

computer excludes all specification embodiments and thus cannot be correct.  Each

embodiment describes that the log generated by the meter is stored in the computer

machine on which the meter is installed before being sent to the central processing

station.  *See, e.g.,* '680 patent, col. 3, ll. 28-31; col. 5, ll. 52-55; col. 5, ll. 60-62;

col. 6, l. 48 - col. 7, l. 4; col. 7, ll. 11-36; col. 7, l. 37- col. 8, l. 23.  As repeatedly

stated by the Federal Circuit, "a claim interpretation that excludes a preferred

embodiment from the scope of the claim 'is rarely, if ever, correct.'"  *On-Line Tech v. Bodenseewerk Perkin-Elmer* at 1138.

Accordingly, NetRatings respectfully requests the Court reject Digital River's proposed construction of the foregoing term and either find no construction is required or adopt NetRatings' proposed construction.

> **4.**      ***identify titles of open windows and reflects a log of titles of worldwide web pages; identify titles of windows and world wide web pages*** (Letter p. 3)

NetRatings does not believe any construction of these terms is required, and Digital River's proposed constructions should be rejected.  Should the Court conclude that some construction is desirable, NetRatings has proposed constructions based on a plain reading of the terms as fully supported by the intrinsic evidence.  *See, e.g.,* '510 patent, col. 4, ll. 11-63 ("[w]indow titles" of applications "generally hold useful descriptions of the activity at that moment"); Ostrow Decl. Ex. P, *MW* at 5 (title is a "distinguishing name"); Ex. Q, *Webster's II* at 6 (title is "an identifying name" or a "general or descriptive heading").  *See also* Ostrow Decl. Ex. N, at A00393 (12/26/96 Response to Office Action at 3) ("The title of the open window will reflect the title of any world wide web page that a user is viewing.").

Digital River proposes that "titles" be limited to "the TITLE tags of HTML of world wide web pages."  Letter p. 3.  No such requirement can be found in the

intrinsic evidence.  Moreover, limiting the claims as Digital River proposes would frustrate at least one described objective of the invention, that of obtaining information useful in describing what a user is doing on the computer.  *See, e.g.,* '510 patent, col. 4, ll. 20-46.  This objective may or may not be possible using what is in the TITLE tag.  A "title tag" is a form of computer code used in the HTML of a web page (which includes numerous different "tags").  The title tag is indicated through the use of an opening "<title>" tag and a closing "</title>" tag. Web page developers may and often do place any text they want between these opening and closing tags, which text will then appear at the top of the window in the so-called "title bar."  The text in a title tag is entirely dependent on what a particular web page owner chooses to put in his web page html.  This could be more or less than what is needed to identify the page.  *Compare, e.g.,* web page title tag variations which show, respectively, (1) the use of text which is not a title, (2) a title tag which has no text between the tag indicators, and (3) a web page with no title tag at all: (1) TITLE tag of www.weather.com ("<title>National and Local Weather Forecast, Radar, Map and Report</title>"); (2) TITLE tag of www.stupidbetty.com ("<title></title>"); and (3) web page http://x.deltaserver.com/suspended.page/ which has no TITLE tag.[10]

---

[10]  *See* Ostrow Decl. Exs. S - X.

Thus, while no construction is believed to be necessary for these terms, in the event the Court believes construction is warranted, NetRatings' constructions should be adopted by the Court.

**C.    Terms From the '155 and '386 Patents**

**1.    *the downloading of the first resource causes the downloading of the tracking program* (Letter p. 4)**

NetRatings does not believe a construction is required for this term.  The concept of the downloading of the first resource being the cause of the downloading of the tracking program is one that a jury should readily comprehend. Yet, Digital River is once again attempting to use claim construction as an excuse to rewrite the claims in a narrowing manner.  Digital River proposes a construction ("the downloading of the tracking program is separate from and results from the downloading of the first resource") that describes one way in which the downloading of the first resource can cause the downloading of the tracking program, but it is only an embodiment and does not provide a basis for limiting claims which are, by their own clear language, not so limited.  *See Verizon Servs. Corp. v. Vonage Holdings Corp.*, 2007 U.S. App. LEXIS 22737 (the "Federal Circuit has cautioned against limiting the claimed invention to preferred embodiments or specific examples in the specification.").

2.    *third server* (Letter p. 4)

NetRatings' proposed construction of this term, "a server which is a different machine from the first server and the second server," should be adopted by the Court, as it properly accounts for the claim language and embodiments described in the specification.  The term "third server" appears in independent claims 1 and 33 of the '155 patent, which both recite a "first server," a "second server," and a "third server."  The separate identification of these three servers draws out that each respective server is a different machine.  *See, e.g., Gillette Co. v. Energizer Holdings, Inc.*, 405 F.3d 1367, 1373 (Fed. Cir. 2005) (noting that the terms "first," "second" and "third" in the phrase "a group of first, second and third blades" are "terms to distinguish different elements of the claim.").  The claims' identification of three different servers also corresponds to the different functions that each server performs: the "first server" provides a resource that is downloaded to the client; the "second server" provides the executable program to monitor use of the resource and generate data representing use of the resource; and the "third server" obtains "client identifying indicia" and receives the resource use data generated by the executable program.  '155 patent, claims 1 and 33.  *See also* '155 patent, col. 11, ll. 41-45 (describing how "[a] Web page" may be requested "from a first server A"); col. 12, ll. 26-28 ("The client, in attempting to render the Web page, will automatically fetch [an] applet by making a request to Server B"); col. 12, ll. 45-47 (information

collected by the applet downloaded from "Server B" "can be stored in a database on

Server B *or elsewhere*") (emphasis supplied).

Digital River's construction fails to provide any indication as to what a third

server *is*, and instead, simply suggests what a third server "*may be*."  The very

purpose of claim construction, however, is to ascertain "the meaning and scope of

the patent claims asserted to be infringed."  *Monsanto Co. v. Syngenta Seeds, Inc.*,

Case No. 2006-1472, 2007 U.S. App. LEXIS 23255, at *7 (Fed. Cir. 2007).

Accordingly, Digital River's construction should be rejected by the Court.

**D.   Terms From the '637 Patent**

**1.   *Application of 35 U.S.C. § 112 (6) to the '637 Patent***

The parties agree that claims 18, 20, 25, 26, 30, 31, 35, 36, and 38-41 of the

'637 patent contain means-plus-function elements subject to 35 U.S.C. § 112(6).

Per the Court's instruction to limit the number of claim terms, the parties identified

the following three means-plus-function elements of the '637 patent for

construction: (1) "means for monitoring the display of content to produce

monitoring information regarding display of the content" (Letter p. 5); (2) "means

for transferring the means for monitoring from the content provider site to the

content display site so that the means for monitoring operates at the content display

site" (Letter p. 6); and (3) "means for transferring the monitoring information to a

remote site that is part of the network" (Letter p. 7).

## 2.    *Means Plus Function Terms*

In construing means-plus-function elements, the function of the element is first determined, and then the corresponding structure for performing the function, as described in the specification, is identified.  *See WMS Gaming Inc. v. Int'l Game Tech.,* 184 F.3d 1339, 1347 (Fed. Cir. 1999).  Where the disclosed structure is a computer, the structure includes the algorithms disclosed in the specification for performing the function.  *WMS Gaming,* 184 F.3d at 1349.  Identification of the specific algorithms which the computer is programmed to perform may be through explicit recitation of text or figures from the specification, or by reference to the column and line numbers for such sections.  *McKesson Info. Solutions LLC v. The Trizetto Group, Inc.,* 426 F. Supp. 2d 197, 202 (D. Del. 2006) (identification of structure includes identifying "the specific algorithm disclosed in the specification, or where it is disclosed (or otherwise inferred)"); *Digeo, Inc. v. Audible, Inc.,* Case No. C05-464, 2006 U.S. Dist. LEXIS 22715, at *45-46 (W.D. Wash. Mar. 27, 2006) (identifying algorithm by citation to column and line references of approximately 77 lines of text); *Bd. of Regents of the Univ. of Texas Sys. v. Eastman Kodak Co.,* Case No. 04-CA-912, 2006 U.S. Dist. LEXIS 7997, at *58 (W.D. Tex. Jan. 26, 2006) (identifying algorithm by citation to two figures).  Accordingly, NetRatings identifies the computer components for performing the function along with citations to the particular specification sections which describe the algorithms.

With respect to the "means for monitoring the display of the content to produce monitoring information regarding display of the content," the structure for this element is a set of computer instructions as described in the specification at col. 11, ll. 9-14, 38-67; col. 13, ll. 17-21; col. 13, ll. 35-40; col. 14, l. 1 - col. 18, l. 10; col. 19, ll. 25-65; col. 25, ll. 38-45, which computer instructions cause one or more computer systems to perform the function recited in the claim. *See, e.g.,* '637 patent, col. 16, ll. 21-24 ("the applet can use a pre-existing Java method (e.g., the method named HandleEvent in a current version of Java) to monitor events as transmitted by the operating system."); col. 16, ll. 25-27 ("monitoring can be used to, for example, determine the number of times that an on-screen pointer (e.g., a mouse arrow or a cursor) entered an area defined by the content display."); col. 16, ll. 34-38 ("an applet configured to display content…can discern whether the pointer is located within the content display by monitoring an event that indicates that the pointer has entered the area defined by the content display."); col. 16, ll. 42-46 ("The monitoring method can…determine when the on-screen pointer leaves the defined area after each entry, by monitoring another event that indicates that the pointer has exited the area defined by the content display."); col. 16, ll. 50-53 ("The monitoring method can also determine when the on-screen pointer is moving within the defined area, again by monitoring an event that indicates such pointer movement.").

With respect to "means for transferring the means for monitoring from the content provider site to the content display site so that the means for monitoring operates at the content display site," the appropriate structure for this element comprises computer instructions implemented on a content provider site, computer instructions implemented on a content display site, and a communication network, as described in following specification sections: col. 7, ll. 66 - col. 8, ll. 5; col. 8, ll. 29-37; col. 10, ll. 58-65; col. 11, l. 38 - col. 12, l. 39; col. 23, ll. 1-9; col. 22, ll. 2-24; col. 25, ll. 13-27; Figs. 3A-3B, 5A-5C, 6A-6D. *See, e.g.,* '637 patent, col. 12, ll. 1-24 (instructions executed by a browser "identify the location ('image') at [a] content provider site of an applet (a small application program) called 'AdInsert' that includes further instructions which, when executed, perform a monitoring method according to the invention, as well as cause the content to be displayed...Upon receipt of the request by the http daemon at the content provider site, the AdInsert applet is transferred to the requesting content display site and begins executing.").

With respect to "means for transferring the monitoring information to a remote site that is part of the network," the appropriate structure comprises computer instructions implemented on a content provider site, computer instructions implemented on a content display site and a communication network, as described in the following specification sections: col. 8, ll. 7-22; col. 10, ll. 22-32; col. 11, ll.

38-57; col. 19, l. 66 - col. 21, l. 6; col. 23, ll. 1-9; col. 25, ll. 32-45; Fig. 3C. *See, e.g.,* '637 patent, col. 8, ll. 55-60 ("According to this aspect, the monitoring information can first be transferred to the content providing site before eventual transfer to the remote site, so long as the monitoring information cannot be stored at the content provider site, or accessed or manipulated at the content provider site before transfer to the remote site."); col. 20, ll. 57-67 ("Transmission of monitoring data by making a request to the http daemon can be accomplished in a variety of ways.  For example, an http request can be submitted for a file having a "name" that denotes the monitoring data in some way.  Notwithstanding the spurious nature of the file request, the request is recorded in the http log file, from which the "name" can be retrieved to enable extraction of the monitoring data.  Or, a request for execution of a CGI script can be transmitted, with the parameter of the CGI script request that specifies input to the script being specified to denote the monitoring data in some way.").

   **3.**   ***instructions for causing content to be displayed by the computer system*** *(Letter p. 7)*

   The foregoing claim term appears in claim 64 of the '637 patent.  Contrary to Digital River's assertion, it is not subject to 35 U.S.C. § 112(6).  Claim 64 does not contain any "means" language, thus giving rise to the presumption that 35 U.S.C. § 112(6) does ***not*** apply.  *Phillips,* 415 at 1311.  Further, the claim identifies sufficient structure in claiming "computer readable medium encoded

with one or more computer programs … comprising instructions …" *See Phillips,* 415 at 1311 ("[m]eans-plus-function claiming applies only to purely functional limitations that do not provide the structure that performs the recited function"); *Affymetrix, Inc. v. Hyseq, Inc.*, 132 F. Supp. 2d 1212, 1231 (N.D. Cal. 2001) ("§ 112, P 6 does not apply to the terms recited in the form, "computer code that [performs x function]."). The *Affymetrix* Court explained that "'computer code' is not a generic term, but rather recites structure that is understood by those of skill in the art to be a type of device for accomplishing the stated functions." *Id.* In the context of the claims and of the patent, there can be no doubt that "instructions" are computer code such as HTML or Java code. *See, e.g.,* '637 patent, col. 12, ll. 1-20 ("instructions [HTML code show in Example 1] . . . are executed by a conventional browser implemented on a computer"). *See also* Ostrow Decl. Ex. Y, *The New IEEE Standard Dictionary of Electrical and Electronics Terms* (Christopher J. Booth ed., 5th Ed. 1993) ("*IEEE*") at 4 (instruction: "[a] meaningful expression in a computer programming language that specifies an operation to a digital computer") and *Universal City Studios, Inc. v. Reimerdes*, 82 F. Supp. 2d 211, 222 (S.D.N.Y. 2000) ("computer code" is "primarily [] a set of instructions which, when read by the computer, cause it to function in a particular way").

Accordingly, claim 64 is not subject to 35 U.S.C. § 112(6), and Digital River's assertion that this term should be treated as a means-plus-function element should be rejected.

## CONCLUSION

For all the reasons stated above, NetRatings requests that the disputed claim terms be construed in the manner proposed by NetRatings.

Dated:  November 13, 2007          LEONARD, STREET AND DEINARD
                                   Professional Association


                                   /s/ Erin Skold_____
                                   Stephen J. Davidson (No.0021301)
                                   Erin C. Skold ( No. 0313683)
                                   Suite 2300
                                   150 South Fifth Street
                                   Minneapolis, Minnesota 55402
                                   Telephone:  (612) 335-1500
                                   Facsimile:  (612) 335-1657

                                             and

                                   DREIER LLP
                                   Seth H. Ostrow, *Admitted pro hac vice*
                                   Arianna Frankl, *Admitted pro hac vice*
                                   Eric C. Osterberg, *Admitted pro hac vice*
                                   Karine Louis, *Admitted pro hac vice*
                                   499 Park Avenue
                                   New York, New York 10022
                                   Telephone: (212) 328-6100
                                   Facsimile:  (212) 328-6101

                                   *Attorneys for NetRatings, Inc.*

305203