UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
FOURTH DIVISION

| | |
|---|---|
| NETRATINGS, INC., | |
| Plaintiff, | |
| v. | Civil No. 06-3988(JMR/FLN) |
| DIGITAL RIVER, INC., *et al.,* | |
| Defendants. | |

**NETRATINGS, INC.'S REBUTTAL CLAIM CONSTRUCTION BRIEF**

Plaintiff NetRatings, Inc. ("NetRatings") submits this rebuttal claim construction brief in further support of its construction of terms from the asserted patents[1] and in response to Defendants' (collectively, "Defendants") Opening Claim Construction Brief ("DB").

## ARGUMENT

**A.    Disputed Terms From The '510 And '680 Patents ("Coffey Patents")**

    **1.    *local computer use meter/user meter* (Letter  p. 1)**

The principal disputes with respect to the term "local computer use meter" are Defendants' improper addition of the limitations "permanently resides" and "operates within its own window," (DB at 6), as well as whether the meter is designed to monitor itself or other software.

Concerning the "permanently resides" limitation, Defendants incorporated a limitation in their construction that concerns how long the meter is on the user's computer.  Defendants try to offset the extremity of their position by mischaracterizing NetRatings' construction as providing that the meter have only a "temporary" or "fleeting" presence.  DB at 6.  But NetRatings' construction contains no temporal limitation at all, as neither the claims nor the specification

---

[1]  In its Opening Brief, NetRatings identified several other cases involving the asserted patents which had claim construction proceedings at various stages.  NetRatings' Opening Claim Construction Brief ("NB") at 1 n.2.  As an update to such identification, NetRatings notes that the hearing which had been scheduled for Nov. 19, 2007 in the *NetRatings, Inc. v. WhenU.com, Inc.*, 06-3556 (PKC) (GWG) (S.D.N.Y.) was adjourned, with no date currently set.

call for such a restriction.  Defendants argue that because the meter is described in

one embodiment as being able to undergo updates, it must be permanent.[2]  To

reach this conclusion, Defendants take two improper steps.  First, Defendants treat

a clearly described *optional* feature (updates) as a necessary feature.  But the

specification is explicit that this is a possible, not mandatory, feature: "[t]he

computer use meter … **may** from time to time undergo system updates."  '510

Patent, col. 3, ll. 6-9 (emphasis supplied).  *See, e.g., Kao Corp. v. Unilever U.S.,*

*Inc.*, 334 F. Supp. 2d 527, 545 (D. Del. 2004) ("permissive 'may' language does

not restrict the claimed invention to a particular formulation, but instead expressly

leaves open the possibility of other formulations.").  Second, Defendants

incorrectly assume that the feature of updating requires permanence.  DB at 7.

However, many software programs are not "permanently resident" on a computer,

but still undergo updates.[3]

---

[2]  Defendants also incorrectly include the updating characteristic in their construction but as explained herein because this feature is clearly described as an embodiment only it is therefore inappropriate for inclusion in the definition of the term.

[3]  For example, Defendants identify Java applets as purportedly not permanent (DB at 7), yet the Java programming language may be used to create an applet that "undergo[es] system updates to add features and the like" through use of the Java Timer object. *See* Exs. A-B to the Decl. of Seth H. Ostrow dated Dec. 10, 2007 ("Ostrow 12/10 Decl.") (http://java.sun.com/j2se/1.4.2/docs/api/java/util/Timer.html); (http://www.javapractices.com/Topic54.cjp).  The Java Timer object allows for the "repeated execution at regular intervals" of specified tasks, wherein such tasks may comprise updates to add features to the Java applet. *Id.*

Defendants also try to support their argument for "permanently resides" with reference to the fact that the meter is "installed in user computer machines." DB at 6. However, "installed" does not inherently require permanence. See Ostrow 12/10 Decl. Exs. C-D (definitions of "installed"). Further, the significance of the term "installed" in the claims is to point out *where* the meter is located -- "installed *in user computer machines*" and thus that the data is being collected at the user machine, rather than at the server. *See* NB at 16-17. Neither the claims nor specification address how long the meter is installed on the user's computer and Defendants' attempt to import a temporal limitation should be rejected.[4]

Defendants also incorrectly contend the meter must "operate[] in its own window." *Letter p. 1*. Again, Defendants are taking a feature clearly described as an embodiment and trying to incorporate it as a mandatory component. For instance, Defendants rely on Figure 2 but according to the specification, "FIG. 2 shows *an embodiment* of the invention" and not a requirement. '510 patent, col. 4, l. 67 (emphasis supplied). Defendants cite to a description of another embodiment, clearly stated to be "an advantageous embodiment," where the meter is minimized

---

[4] Defendants continue their inappropriate approach to claim construction by relying on statements made in an entirely unrelated patent application to support its assertion that the meter is a "permanently resident application." DB at 7. The statements were neither intended, nor constitute a definition of claim terms in the Coffey patents and comprise irrelevant and unrelated extrinsic evidence. *See Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 986 (Fed. Cir. 1995) (explaining how extrinsic evidence may be used to assist the Court in understanding the technology at issue, but not construing the terms themselves).

after start up.  DB at 8.  Defendants then contend that because in one embodiment the meter is in its own window and is minimized after start up, this requires that the meter always be in its own window.  DB at 8.  There is simply no basis for such a leap.  Defendants are taking a feature explicitly described as an embodiment only, and then reading another feature clearly expressed as an embodiment only into the construction as a requirement.  As the Federal Circuit has stated, "the scope of the claims [are] not limited to particular embodiments depicted in the figures or described in the written specification."  *Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354, 1365 (Fed. Cir. 2004).

The parties also disagree as to whether the meter monitors itself, other programs or both.  Defendants mischaracterize NetRatings' proposed construction as requiring that the meter **only** monitors other programs.  DB at 9.  NetRatings' construction properly identifies the meter as a "software program *designed* to collect information regarding the use of other software programs…"  *Letter p. 1* (emphasis added).  This construction acknowledges that the meter may collect information about its own operation, but focuses on the aspect of the meter which is to collect information about other software programs.  This focus is fully supported by the patents' specifications.  *See, e.g.,* '510 patent, col. 2, ll. 21-26 ("According to the invention, a meter application installed in a personal computer may log events for top-level Windows for any given application.  Events which are

specific to child Windows of an application may not necessarily be logged.  For certain applications, additional detailed event logging for such child Windows will occur.").  *See also* '510 patent, col. 1, ll. 57-60 ("A system according to the invention may filter through a vast array of messages and capture only specific messages, such as those message which indicate a change in focus from one application to another."); '510 patent, col. 2, ll. 21-23 ("a meter application installed in a personal computer may log events for top-level Windows for any given application."); '510 patent, col. 2, ll. 34-38 ("it is an object of the invention to monitor and log certain external communications.  The local meter application will monitor strings of characters sent to a communication port such as a modem.").  These descriptions in the patents are also consistent with the ordinary meaning of a meter -- meters record information about something else.  *See* Ostrow 12/10 Decl. Ex. E, *Webster's II New College Dictionary* (1995) (meter is "a device designed to measure . . . or indicate and regulate or record the volume or amount of something . . .").  Thus, while the meter may collect information about itself, what makes it a *meter* is the collection of information about *other* software programs.

    **2.**    **_log of predetermined [machine operation] events_** *(Letter p. 2)*

For this term, Defendants' build in limitations requiring the log have "multiple chronological records or entries" and be a "file."  DB at 10.  Neither limitation is warranted.

Defendants argue that the log must have "multiple chronological records or entries" because, according to Defendants, logs have an "inherent temporal" aspect. DB at 10. Defendants' inherency argument should be rejected. "Logs" in general can be of virtually anything, depending on the context and what the keeper of the log determines to record. *See* NB at 18 (discussing numerous definitions of log, all a "record" varying in context of what they are recording). But the context we must be concerned about here is the context of the patent. The patents' claims here specify what the log must be -- a log of predetermined events which, in the case of the '510 patent, identifies titles of windows and web pages and, in the case of the '680 patent, identifies character strings reflecting on-line activity. *See, e.g.,* '510 patent, claim 1; '680 patent, claim 1. Incorporating any other requirements into the claimed log would be inappropriate, particularly where numerous different embodiments are contemplated. *See* NB at 19 (discussing dependent claims and specification examples of embodiments which include date and time information, along with a variety of other types of information and formats). Still further, the example log which is provided in the patents (only a selective part of which is excerpted by Defendants), shows a number of entries for events which either have no time aspect to them at all (as in the "PANEL" entry which identifies the panelist's name), or the set of entries which are all at the same time and illustrate

the use of the meter to capture a picture of events on the computer as of a certain

point (*e.g.,* when the meter is invoked):

| 00001 | 05/25/95 | 10:40:27 | METER | 1234561 0000 | [D=02.00-02] |
|---|---|---|---|---|---|
| 00002 | 05/25/95 | 10:40:27 | PANEL | 1234561 0000 | [D=John Doe] |
| 00003 | 05/25/95 | 10:40:27 | START | 1234561 0000 | [D=ini StartTask=1 EndTask=1 Minimize=2 Maximize=1 Activate=1 Restore=1 Running=1] |
| 00004 | 05/25/95 | 10:40:27 | RUNNG | 1234561 2a96 | [D=C:\DOS\MOUSE\POINTSR.EXS] [T=Pointer Options] [S=10432] |
| 00005 | 05/25/95 | 10:40:27 | RUNNG | 1234561 201e | [D=C:\WINDOWS\NETDDE.EXS] [T=NetDDE] [S=$2432] |
| 00006 | 05/25/95 | 10:40:27 | RUNNG | 1234561 1f6e | [D=C:\WINDOWS\SYSTEM\ DDEML.DLL] [S=39424] |
| 00007 | 05/25/95 | 10:40:27 | RUNNG | 1234561 0736 | [D=C:\WINDOWS\SYSTEM\ USER.EXE] [S=264096] |
| 00009 | 05/25/95 | 10:40:27 | RUNNG | 1234561 37de | [D=C:\HTI\HTI.EXE] [T=HTI] [S=55656] |
| 000010 | 05/25/95 | 10:40:27 | MIMIM | 1234561 37de | [D=C:\HTI\HTI.EXE] |

'510 patent, col. 8, ll. 32-44.

Defendants' proposed construction further requires that the "log of

predetermined [machine operation] events" be limited to a "file."  DB at 11-12.

Such a limitation is contradicted by the patents' reference to many different types

of logs, only some of which are characterized as "files."  NB at 18-19.  The

specification examples Defendants cite only confirm this.  For instance,

Defendants cite to Figure 1 referring to an "event log file."  However Figure 1 is

identified as a "flow diagram of **an embodiment** according to the invention," not a

set of requirements.  '510 patent, col. 5, ll. 8-10 (emphasis supplied).  Defendants

also rely on a reference to a log "file" in the Abstract but the Abstract, at only four

sentences, is clearly not intended as a comprehensive description of all

embodiments nor can it be used to limit the scope of the claim term. *See, e.g.,*

*Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 908 (Fed. Cir. 2004) (an

embodiment described in an abstract does not limit the scope of a claimed

invention).

**3.** ***stored in an associated user computer machine*** (Letter p. 3)

Defendants' incorrect interpretation of this term would call for the meter and

the log it creates to be on different computers.  As explained in detail in

NetRatings' Opening Brief, Defendants' interpretation would exclude all

specification embodiments and thus cannot be correct.  *See* NB at 20-22.

Defendants argue that if the meter and log of element 1 of the '680 patent

were intended to be on the same computer machine, the patentees should have used

the word "said" to refer back to the user computer machines referenced in the first

part of the claim element, instead of the word "associated."  DB at 15.  Defendants

are incorrect.  The first reference to "user computer machines" is to the plurality of

such machines -- not a specific one of such machines.  On the other hand, the later

reference to "an associated user computer machine" is a reference to a specific one

of the plurality, not all of them.  Thus, the claim recites "an associated user

computer machine" because there is no specific reference earlier in the claim to an

individual user computer, only the plurality of computers.  This shift from plural to

singular also makes Defendants' argument contrasting claim 1 of the '680 patent

with claim 1 of the '510 patent inapt.  Claim 1 of the '510 patent recites a plurality of computer machines throughout the entire element, whereas claim 1 of the '680 patent has the plural to singular shift.[5]  Defendants' comparison thus does not withstand scrutiny.

Finally, Defendants' contend that their construction is supported by the claim language itself, that "associated" should mean "other than" or "different" based on the plain meaning of "associated."  But as Defendants point out, the plain meaning of associated is "connected, joined, or related" (DB at 15-16), not "other than" or "different."  The ordinary meaning of the word "associated" is more consistent with NetRatings' construction, particularly when viewed in light of the patent specification as a whole, which is how the claims must be understood.

**4.      *identify titles of open windows and reflects a log of titles of world wide web pages* (Letter pp. 3-4)**

As elsewhere, Defendants mischaracterize NetRatings' proposed construction of this term, this time contending that NetRatings seeks to omit the concept of a "title."  DB at 16.  To the contrary, NetRatings' construction is specifically directed at construing the word title ("characters identifying" a

---

[5]  In fact, if the patent had used the term "said" instead of "associated," the phrase would lack antecedent basis as the claim refers to "user computer machines," not a single "user computer machine."

window or web page), but NetRatings believes use of the claim language itself
would be best.

The fundamental difference between the parties' constructions is that
Defendants try to limit "titles" to those that are obtained from just two sources: (i)
the text from the TITLE tag of HTML (for titles of web pages) and (ii) the text
from the title bar of an open window (for titles of open windows).  DB at 17.
Defendants' attempt to limit "titles" in this manner both lacks support in the
intrinsic evidence and actually contradicts embodiments described in the
specification.  First, replacing "TITLE tags of HTML" with "titles" is
inappropriate as there is simply no support in the intrinsic evidence that this is
what the applicants meant by "title."  *See* NB at 22-23.[6]  Further, Defendants'
contention that the title of windows must be taken from the title bar (DB at 17)
actually contradicts a described embodiment.  In one specification example, the
applicants identified a specific title which might be collected by the meter but that
example was not all of the text from the title bar but rather just part of that text --
that part which was sufficient to provide the title.  *See* '510 patent, col. 4, ll. 20-23

---

[6] Defendants' construction is also internally inconsistent.  In one case, Defendants
simply repeat the claim language "titles of open windows" and in the other,
Defendants replace "titles of world wide web pages" with "characters identifying
the TITLE tags of HTML of world wide web pages."  DB at 17-18.  In so doing,
Defendants violate the settled principle that the same words in a claim should be
construed consistently.  *See, e.g., Callicrate v. Wadsworth Mfg., Inc.*, 427 F.3d
1361, 1371-72 (Fed. Cir. 2005).

(with reference to Prodigy's electronic mail window, identifying the title as "Write"); and Ostrow 12/10 Decl. Exs. F-H (article and screen shots of the Prodigy email window showing that the full text of the title bar was "Prodigy Mail - Write" and "Prodigy® Service - WRITE").

In contrast to Defendants' position, NetRatings believes the term titles should be given the meaning clearly intended in the patent, that is, a name or group of characters (to speak in computer terminology) which provides a meaningful identification of what window is open and what web page is being viewed by a user. That is the concept of significance to the patent, as related in the patent itself and in the prosecution history. *See* NB at 22-23. *See also* Decl. of Seth H. Ostrow, dated Nov. 13, 2007, Ex. N at A00393-394 (through logging titles of windows and web pages, "the computer use meter captures and identifies any world wide web pages which are being used by the user. The log from a plurality of community [sic] of these meters are transferred to a central processing station which can process and analyze the use habits of the users. This information is very valuable to anyone who is interested in the nature and extent of computer use and access to the  world wide web."). Thus, the patent is not concerned with *where* titles are taken from (*e.g.,* file names, HTML of the web pages, title bars of windows), but rather that titles were captured to permit reporting about where people go on the web.

**B.**   **Disputed Terms In The '386 And '155 Patents ("Davis Patents")**

**1.**   ***the downloading of the first resource causes the downloading of the tracking program*** *(Letter p. 4)*

For this term, Defendants argue that because the "downloading of the first resource *causes* the downloading of the tracking program," the "first resource" and the "tracking program" may not "come into existence simultaneously."  DB at 23. Defendants' argument is misguided because it relies on the concept of creation of the resource and tracking program ("come into existence").  The claim, however, is concerned with downloading, not creation.  It can be and, in fact, is the case that both the resource and the tracking program could be downloaded at the same time but as a result of the resource being requested.  For example, when a user requests a specific file and the tracking program is contained within that file, it is the request for the *file* that causes the download of the tracking program (*rather than a request for the tracking program itself*).  Indeed, this is precisely what is claimed in dependent claims 2, 3, 14 and 15 of the '386 patent.  Defendants' construction which would preclude these dependent claims cannot be correct.[7]

_____

[7]  Defendants point to examples in the intrinsic evidence which describe how a URL for a tracking program can be embedded in a web page.  DB at 23-24.  These examples simply illustrate that the patentees used the word "embedded" to mean either contained within, or incorporated by reference.  *See, e.g.,* '386 patent, col. 4, ll. 47-55 (the tracking program may be "embedded in a file which is downloaded" and "need not originate from the same server that sent the file" but rather "via an embedded URL" or how the "tracking program may be part of a larger program that performs other operations (such as displaying animations, playing sounds, etc.).").

2.    *third server* (Letter p. 4)

The dispute concerning this term is Defendants' contention that the "third server" may be the same as the first or second server. This ignores the explicit claim language which recites a three server configuration.

Defendants argue that their construction is supported by examples in the specification which show the use of two servers A and B. DB at 20. However, the patent also describes embodiments using three servers. *See, e.g.,* '155 patent, Abstract ("downloading a file . . . from the first server [specifying] an address of a first executable program located on a second server . . . and uploading the amount of time determined by the first executable program to *a third server*"); col. 11, l. 41 - col. 12, l. 47 (describing an implementation of the invention using a "server A" and "server B (*or any other server*)") (emphasis supplied).

Defendants also argue that the third server must be the same as the first or second servers, or else language in the claims about the first and second servers would be superfluous. DB at 21-22. It is Defendants' construction which would render claim language superfluous. To adopt Defendants' construction would be to entirely ignore the "third" portion of the claim term. Indeed, the applicants would have simply claimed the "first or second server" in lieu of the "third server."

Defendants further argue that the third server is the same as the first or second servers because "[a]t the time of filing of the '155 patent, a security feature

13

of Java prevented an applet from sending data to a server other than the one from

which the applet was downloaded." DB at 22.  Defendants' argument fails

however because the specification expressly discloses that the tracking program

can be written in languages other than Java.  *See, e.g.,* '155 patent, col. 17, ll. 46-

62.

Defendants' construction of the "third server" should accordingly be rejected

and NetRatings' construction adopted, or no construction entered.

**C.   Disputed Terms In The '637 Patent ("Blumenau Patent")**

**1.   *Means terms: means for monitoring display of the content to
produce monitoring information regarding the display of the
content; means for transferring the means for monitoring from the
content provider site to the content display site so that the means for
monitoring operates at the content display site; means for
transferring the monitoring information to a remote site that is part
of the network* (Letter pp. 5-7)**

The parties' disputes over these terms centers on (1) Defendants' limiting

the disclosed structure to a Java applet, (2) Defendants' limiting the description of

the algorithms for performing the function to one to two phrase sound bytes, rather

than acknowledging the full breadth of the described algorithms, and (3)

Defendants' contention that the means for monitoring must also include means for

displaying content.

Defendants' contention that the structure is limited to a Java applet is

incorrect for at least two reasons.  First, structure in a computer patent is

14

determined with reference to the algorithms disclosed in the specification, not a specific computer language.  *See, e.g., WMS Gaming Inc. v. Int'l Game Tech.,* 184 F.3d 1339, 1349 (Fed. Cir. 1999).  Defendants' identification of Java as structure is thus erroneous.  Further, the patent explicitly states that the computer programs of the invention "can be implemented using any appropriate computer programming language."  '637 patent, col. 11, ll. 59-63.  *See also* '637 patent, col. 25, ll. 38-44. Defendants acknowledge this portion of the specification, but give it short shrift as being insufficient to disclose structure.  DB at 28.  Defendants again miss the point -- the structure is not a specific computer programming language, but the algorithms which make up the program.  Where a patentee has described algorithms for carrying out the function, there is no requirement that such algorithms be recited in every conceivable computer language.  Indeed, the Federal Circuit has held that "[i]f an apparatus claim recites a general structure without limiting that structure to a specific subset of structures, [the court] will generally construe the term to cover all known types of structure that the patent disclosure supports."  *CCS Fitness v. Brunswick Corp*., 288 F.3d 1359, 1366 (Fed. Cir. 2002). *See also Fonar Corp. v. General Elec. Co*., 107 F.3d 1543, 1549 (Fed. Cir. 1997) ("where software constitutes part of a best mode of carrying out an invention, description of such a best mode is satisfied by a disclosure of the functions of the software.  This is because, normally, writing code for such software is within the

skill of the art, not requiring undue experimentation, once its functions have been disclosed.")

Defendants attempt to limit the structure for these means claims with short sound-bytes purporting to summarize algorithms disclosed over several columns of specification.  However, NetRatings is entitled to the full scope of structure disclosed in the patent.  *CCS Fitness v. Brunswick Corp.*, at 1366.  Defendants criticize NetRatings for citing to the specification directly to identify the algorithms disclosed.  DB at 27.  Yet, Defendants cite to nearly as large portions of the specification themselves (they just provide their own abridged summaries of those sections).  DB at 28.  Defendants contend that referring to specification sections will be difficult for the jury.  DB at 32-33.  NetRatings disagrees.  The jury will not be required to parse through all of the specification language.  It is NetRatings that will have the burden of proof at trial, and NetRatings should be able to select from those algorithms in the specification that it believes are most appropriate to present to the jury for decision at that time.

Finally, Defendants' construction requires that the means for monitoring include means for displaying.  Such a construction inappropriately limits the claims based on embodiments described in the specification.  As described in the specification, "*in a particular embodiment*, the monitoring instructions are part of a computer program that also includes instructions for displaying the content."  '637

patent, col. 11, ll. 59-61(emphasis supplied). Similarly, the specification describes that "the monitoring method *can* be implemented as part of a broader method according to the invention that also causes the content to be displayed," demonstrating that both the display and monitoring of content is simply one embodiment of the invention. '637 patent, col. 13, ll. 1-5 (emphasis supplied). Claim differentiation also requires rejecting Defendants' construction. Claim 64 of the '637 patent recites an element including "instructions for causing content to be displayed" and a separate element including "instructions for monitoring display of content." This distinction in the patent makes clear that the patent does not treat display of content and monitoring as necessarily integrated.

Defendants rely on their erroneous proposed constructions of the "means for monitoring" term to support their proposed constructions of the "means for transferring" terms. DB at 33-34. As described above, however, the structure for the "means for monitoring" term is clearly not limited to a Java applet and, for the same reason, Defendants' proposed constructions of the "means for transferring" terms are incorrect.

2.      *Instructions for causing content to be displayed by the computer system*

Defendants argue that the foregoing term should be construed as a means-plus-function element. Defendants' argument disregards the explicit structure recited in the claim term and in the preamble of the claim in which the term

appears.  First, "instructions" does recite adequate structure.  *See* NB at 31-32.  *See also Alacritech, Inc. v. Microsoft Corp.*, Case No. 04-03284, 2005 WL 850729, at *3 (N.D. Cal. Apr. 12, 2005) (holding that claim term "'a set of instructions executable on a processor' sufficiently discloses the structure as software").[8]

Further, the claim in which this term appears begins with a preamble which states: "**A computer readable medium** encoded with one or more computer programs … comprising instructions …."  '637 patent, claim 64 (emphasis added).  This provides more than sufficient structure in and of itself.  *See Trading Technologies Int'l, Inc. v. E-Speed, Inc.*, Case No. 04 C 5312 and related cases, 2006 WL 3147697, at *13 (N.D. Ill. Oct. 31, 2006) (recognizing that "computer-readable mediums … are known in the art to include a structural component" and holding that "program code" recited sufficient structure).  The preamble thus provides further grounds for finding that the element is not a means element.

Defendants attempt to support their argument by stating that the patentee and examiner used "instructions for" and "means for" as equivalents.  However, none of the discussions were directed to what was meant by "means" versus

---

[8]  Defendants' citation to *Altiris, Inc. v. Symantec Corp.,* 318 F. 3d 1363 (Fed. Cir. 2003) is inapt.  That case involved construction of a means claim (and thus was presumptively lacking structure) and the Court pointed out how the claim element's use of the word "including" without specificity indicated that there was more to the claim for which reference to the specification was necessary.  *Altiris,* 318 F.3d at 1376.  The Court also distinguished the case from others where specific physical structure was identified, which was adequate structure.  *Id.*  Here, the claim expressly recites physical structure in the form of a "computer readable medium."

"instructions" nor to whether "instructions" was adequate structure. In fact, the specific prosecution history excerpt quoted by Defendants refers to "means for, instructions for, or a step for" and "means/step/instructions." DB at 37. To accept Defendants' argument would be to conclude that the patentee and examiner also believed that means and instructions were also the same as *a step*. But even Defendants do not take such a position. The logical read of these portions of the prosecution history is simply that the patentee and examiner were using shorthand references to facilitate discussion of numerous claim terms in groups. This cannot be adequate to prove that this instructions term lacks structure.

In short, there is insufficient basis for overcoming the presumption that the instructions element is not a means claim. *See Mass. Inst. of Tech. & Elecs. for Imaging, Inc. v. Abacus Software*, 462 F.3d 1344, 1356 (Fed. Cir. 2006) (it is rare for courts to find "a limitation not using the term 'means'" is means-plus-function and "the circumstances must be [unusual] to overcome the presumption.").

## CONCLUSION

For all the reasons stated above, NetRatings respectfully requests that the disputed claim terms be construed in the manner proposed by NetRatings.

Dated:  December 10, 2007

LEONARD, STREET AND DEINARD
Professional Association

/s/ Erin Skold
Stephen J. Davidson (No.0021301)
Erin C. Skold ( No. 0313683)
Suite 2300
150 South Fifth Street
Minneapolis, Minnesota 55402
Telephone:  (612) 335-1500
Facsimile:  (612) 335-1657

and

DREIER LLP
Seth H. Ostrow, *Admitted pro hac vice*
Arianna Frankl, *Admitted pro hac vice*
Eric C. Osterberg, *Admitted pro hac vice*
Karine Louis, *Admitted pro hac vice*
499 Park Avenue
New York, New York 10022
Telephone: (212) 328-6100
Facsimile:  (212) 328-6101

*Attorneys for NetRatings, Inc.*

310126